FREDERICK N. LEWIS, Plaintiff, *v.* NEW YORK MUNICIPAL RAILWAY CORPORATION et al., Defendants.*

(Supreme Court, Queens Special Term, ––––––, 1919.)

*Lien — foreclosure — rescission of contract — lien discharged of record — action to recover on quantum meruit — judgment for defendant on counterclaim.*

ACTION to foreclose a lien.

Edward M. & Paul Grout, for plaintiff.

M. Carl Levine, for defendants Conners Bros., Inc., and Massachusetts Bonding and Insurance Company.

KELBY, J. The action is to foreclose a lien. The defendant Conners Bros. Company on the 15th day of November, 1915, entered into a contract in writing with the New York Municipal Railway Corporation to construct concrete foundations and to erect thereon approximately two and two-tenths miles of a two-track elevated railroad structure known as section 2 of the Jamaica line, commencing at a point on Jamaica avenue, near Walnut street, and running thence easterly

––––––––––

*Affirmed by the Appellate Division, Second Department, October 3, 1919, on the opinion below.— [REPR.

along Jamaica avenue, in the borough of Queens to Cliffside avenue, formerly Grant avenue. The work to be done under said contract was divided into five items. Item 1 was for the foundation excavation, and item 2 was for the construction of concrete foundations for piers or columns. On January 12, 1916, plaintiff, Frederick N. Lewis, entered into a contract in writing with the Conners Bros. Company, Incorporated, by the terms of which plaintiff undertook to perform items 1 and 2 of the said contract made by Conners Company with the railroad company for the agreed unit price of one dollar and twenty cents for each cubic yard of excavation and five dollars and ninety cents for each cubic yard of concrete masonry. Plaintiff entered upon the performance of the last-named contract and actually continued work down to and including May 29, 1916. On the 1st day of June, 1916, the plaintiff formally notified the Conners Bros. Construction Company that they elected to rescind the said contract. This was in conformance with a previous letter by the plaintiff to the said defendant, dated May twenty-ninth, wherein he stated an intention to abrogate the contract. The express ground of rescission was that the work that he was being required to do was at variance with the contract, contract drawings, and certain other set of drawings, entitled " Supplemental Drawings," showing existing conditions above; the specific ground being that the contract and drawings above referred to showed the location of columns behind existing curbs, while the defendant and the railroad company were insisting upon the columns being erected in front of existing curbs, except in a few instances, where proposed curb lines have been shown in the contract drawings. The lien filed herein was bonded and discharged of record.

The plaintiff now sues on a *quantum meruit* after rescission, because of the alleged breach of the contract

by Conners Bros. Company, Incorporated, and he has adduced evidence showing the reasonable value of the work performed to be $7,526.70. The defendant Conners Bros. set up a counterclaim, alleging that the plaintiff breached his contract, and setting up damages of $35,000. The sole question then is: Which party breached the contract?

The contract of the plaintiff with Conners Bros. provides that he will " furnish all materials and labor and tools * * * necessary * * * for the performance * * * all the excavation, masonry work, and incidentals, as set forth in items 1 and 2 in the contract " between the railway company and Conners Bros., and further provides it shall be done " according to the specifications and plans set forth and referred to in said contract, and which said plans and specifications, so far as they relate to said items 1 and 2, are hereby made part of this agreement," and again, "All necessary lines, locations and grades * * * will be furnished * * * by the engineer of the New York Municipal Railway Corporation, under whose direction and to whose satisfaction the work is to be performed."

The main contract between the railway company and Conners Bros. provides that " a description of the work to be done is set forth, and the requirements, provisions, and details and specifications are stated in the printed form of contract and in the drawings therein referred to;" and at page 3 of the same contract it is provided that the contractor " shall complete the works * * * in accordance with this contract and specifications and drawings herein mentioned: * * * Provided, however, that the said drawings may from time to time be altered or modified as hereinafter provided." There is a further provision on page 5, subdivision 7, which gives the company the right, during the progress of the work, to amplify

the plans and to add explanatory specifications and drawings; and subdivision 8 on the same page: "The company further reserves the right to alter in any way in which it may deem necessary the drawings aforesaid in part or altogether at any time during the progress of the work, without constituting any ground for any claim by the contractor for payment or allowance for damages or extra service on any basis other than that provided for in the schedule of prices for items of the different classes of construction involved in such changes or alterations. All work thus occasioned is not susceptible of classification under the schedule of prices than as otherwise provided herein." At page 25, subdivision 2, is found the following: "(2) The precise location, dimensions and other characteristics of the works are more fully stated in the specifications forming a part of this contract and on the detail drawings and plans hereinafter mentioned." And at page 27: "(1) The drawings referred to in this contract and specifications are divided into two general classes: Contract drawings C2901 to C2914, inclusive. The second class comprises drawings showing the details of elevated construction and are numbered as follows: Standard drawings, C886, C2538, A46, A523–1, A683, A684. In the contract drawings themselves, C2902 to C2910, both inclusive, are designated as alignment plans, and C2911 is designated as typical cross-section and details." The alignment plans above mentioned — that is, C2902 to C2910, both inclusive — are drawn to scale, and they show either "existing curb" or "proposed curb lines;" the curb line without any notation being existing curb line.

An inspection of these alignment plans shows that there were but few proposed changes in the curb line. The engineer of the railway, however, stated that he knew that there was going to be a substantial change in the curb line, but that he did not know whether the

general contractor knew of this change of curb line by the city or not. It seems to me clear that the alignment plans were intended to and did show the existing curb along the work. C2911, denominated " a typical cross-section and details," contained two half sections showing the type of construction with columns on curbs, and another half section showing type of construction with columns in street, and a general note on said plan reads as follows: " Information to be supplied later as to which cols. are on curb and which are in street." The distance from the center of the street to the center of the column is indicated by the word " varies," and this latter is with relation to columns on curbs. The half section with columns in street, the distance from the center of the column to the center of the street is indicated as thirteen feet, plus or minus. It appears from the evidence that the American Bridge Company was given the order for the steel on behalf of the contractor, and that the contractor authorized the railway company to deduct from his contract price the amount to be paid for said steel, and that on December 24, 1915, said company had received and commenced to fabricate the form of steel construction for piers on the curb. On September 29, 1915, the railway company furnished plans C5051 to C5071, inclusive, which are denominated " plans showing existing wiring conditions," and which were drawn to scale showing existing curb line, and in a few instances proposed curb, exactly as did the contract drawings. They also contained symbols of a dot within a small circle delineating proposed foundations. These foundations were behind the existing curb line, or behind the proposed curb line which had been set forth on the contract plans. This delineation of proposed foundations could not, of course, be a picture of " the existing conditions," but apparently located with a fair degree

44

of accuracy that said foundations were behind existing curb.

On January 12, 1916, the date of the signing of the contract between Lewis and Conners Bros., the detailed work plan of the column foundations was completed, and these called for a new curb not shown on either the contract plans or the existing wire condition plans, and by these detailed work plans 126 of the 244 piers east of Queens boulevard were located in front of existing curb line, but actually behind a new curb line that had been established by the local authorities. The action of the local authorities narrowed the street by pushing out into the roadway the proposed curb in front of the existing curb. It is claimed by Lewis that before he entered into the written agreement between himself and Conners Bros. on January 12, 1916, he called upon Conners and stated in effect that the contract plans given him did not locate the columns with sufficient accuracy, and that he could not give Conners any price without knowing the position of the columns with respect to the curbs, and that Conners thereupon said that the columns were all behind the curbs, and that he was informed by Conners or by Mr. Lee, an employee of Conners, in the presence of Conners, that there could not be any doubt about the location of the columns, for the reason that the steel had been ordered for that form of construction which provided for the columns on the curbs, and that reference was then made to plan C2911; and plaintiff further contends that the plan showing existing wiring conditions was then produced by Mr. Lee in the presence of Conners, and that there was specifically pointed out to him the proposed columns shown on said plan, and that Lee said those showed the location of columns. This is absolutely denied by both Conners and Lee; the defendant's contention being that the only papers given to Lewis were the contract and specifications, the contract

drawings, and a drawing showing subsurface conditions. Lewis further says that relying on this statement as to all the piers, or practically all of them, being behind the existing curb and the showing of this wiring drawing, he prepared his figures and signed a contract and also an option which gave to Conners the right to accept his bid within the next twenty-five days.

On January 24, 1916, and before the exercise of the right of acceptance of the option by Conners, Lewis wrote to Conners Bros. in part as follows: " I have been giving much time during the past ten days looking into your work cn Jamaica avenue, and I find that I have made you a lower price than I would have given, had I taken more time to consider it. However, I will stand by my proposal, if my understanding is correct in the following particulars based upon the information you gave me: (1) Contractor is to be paid for the width of 6 inches outside the line of excavation for each size of footing. (2) Water and gas mains will be allowed to go through footings without change; small service pipes, gas or water, house connections, etc., to be offset around the footings. (3) All footings to be behind the curb. (4) You to turn over to me your price on cement at $1.66 a gross."

Three days later, January 27, 1916, defendant wrote to plaintiff a letter stating: " In accordance with our option, we have executed and signed the contract between you and ourselves for the work on section 2, Jamaica Line, and are inclosing the same herewith." This letter also stated in terms that it acknowledged " receipt of your favor of the 24th inst. and note the various suggestions made by you." The defendant then acquiesced to that part of plaintiff's letter concerning payment for excavation to be made on the basis of six inches outside the lines of excavation for each size of footing, and also undertook to turn over price for cement at one dollar and sixty-six cents gross

per barrel. Defendant declined to acquiesce in the other two proposals contained in plaintiff's letter of January 24, 1916. This necessarily declined plaintiff's proposition that "all footings were to be behind the curb." Defendants stated that "we would not like to entertain any of the other suggestions contained in your letter, as it might raise the question of modifying the terms of the agreement, and it is better for both you and ourselves not to do so."

There is no question that this letter of defendant was received by plaintiff, for it inclosed the contract and option to plaintiff. The latter then discovered that defendant had not signed the contract but only the option, and on January 28, 1916, plaintiff brought the contract to defendant, and it was then properly executed. Nothing was then said about modifying the contract to conform to the terms of plaintiff's letter as to "all footings to be behind the curb." Plaintiff contends this letter was "interpolated" in the contract, and that he did not see it or read it until three or four weeks afterward. The contract consisted of seven typewritten pages on the letter head of the defendant; the option being on an additional page. I find nothing to support plaintiff's claim that defendant placed his letter with the contract, so as to cause it to be overlooked by plaintiff. The letter and contents were delivered in the ordinary course of business, as the parties customarily did. Subsequently, and on February first, plaintiff received a letter from defendant, dated February first, which in express terms stated: "Will you kindly forward bond as mentioned in the contract, and referred to in letter of January 27, so that records may be complete on this matter." This last letter was sent by plaintiff to Mr. Porter, agent of the bonding company, with request that bond be furnished. Mr. Porter, when called as a witness to corroborate plaintiff's theory that the contract was

predicated upon the " plans showing wiring conditions," stated that defendant's employee, Lee, stated to Lewis that these plans (plans showing wiring conditions) " are the electrical drawings, the columns are indicated, but you cannot take that for granted."

Under this state of facts the plaintiff has not sustained the burden of proving the contract alleged in the complaint, and I find the plaintiff's bid was predicated on the contract of the railroad with defendant Conners Construction Company, and the drawings therein referred to and the " drawings showing existing conditions taken from data furnished from the various city departments, gas companies, and water supply companies." The express ground of rescission having been the placing of piers and their foundations in front of existing curbs, the plaintiff can be heard on no other ground for rescission. *Littlejohn* v. *Shaw,* 159 N. Y. 188. Nor does the evidence sustain a finding that the placing of piers in front of existing curb increased the cost of the work. The water main east of Queens boulevard was under the sidewalk area, and the piers having been moved out in the roadway, were moved away from the location of the water main. Nor is the evidence satisfactory as to increased costs on the surface.

It must, therefore, be held that defendant did not breach the contract. It follows from the above that plaintiff has not performed the contract on his part, and is liable over to defendant for the breach on the counterclaim pleaded. The measure of damages is the difference between the contract price and the fair and reasonable cost to the defendant of completing the work. I find the reasonable cost to defendant up to January, 1918, was $79,272.74, that there was paid to plaintiff in cash $3,901.50, that the reasonable value of asphalt to be done is $1,000, sidewalks to be done $400, work with relation to changed curbs to be done

$1,875, making a total of $86,449.24, less $825 for expert opinion of engineers and $100 salvage, making $85,524.24 as total costs, and find that the cost at the contract rate fixed by plaintiff's contract is $55,049.31, leaving an excess of $30,474.93, for which judgment is directed in favor of defendant against plaintiff, with costs.

Judgment accordingly.